COMMONWEALTH *vs.* BREAKWATER COMPANY.

Barnstable.   January 13, 1913. — February 25, 1913.

Present: RUGG, C. J., MORTON, LORING, BRALEY, & SHELDON, JJ.

*Boiler*, Inspection.   *Constitutional Law*, Police power, Federal jurisdiction, Interstate commerce.   *Words*, "Jurisdiction," "Vessel," "Equipment," "Barge," "Sea-going."

In St. 1907, c. 465, as amended by St. 1909, c. 393, § 1, providing in part that "All steam boilers and their appurtenances, except . . . boilers under the jurisdiction of the United States, shall be thoroughly inspected," the words, "boilers under the jurisdiction of the United States," mean boilers over which the power of the United States already has been exercised and as to which, because they are solely subject to federal law, a State law in no event could be effectual.

A flat-bottomed barge, moved only by towing and carrying cargo only upon its deck, is a "vessel" within the definition stated in U. S. Rev. Sts. § 3.

The fact that a vessel is licensed and registered under the federal laws does not necessarily remove it from the police power of a State.

The word "equipment" as used in 35 U. S. Sts. at Large, c. 212, § 10, which among other things directs local inspectors of steamboats to "inspect the hull and equipment of every sea-going barge of one hundred gross tons or over" and to be satisfied that such barge "is in a condition to warrant the belief that she may be used in navigation with safety to life," does not mean merely the appliances referred to in § 11 of the statute, but means everything connected with the barge which may affect the safety of life and includes a boiler used in the moving of the cargo.

---

At the trial of a complaint for a violation of St. 1907, c. 465, as amended by St. 1909, c. 393, requiring the inspection and approval of steam boilers not "under the jurisdiction of the United States," the alleged violation being a failure to inspect a boiler on a barge of three hundred and thirty net tons, one hundred and fifteen feet long over all and thirty-five feet wide, with two bulkheads extending its entire length, both ends square, a flat bottom, and no sails nor means of self-propulsion nor rudder, the question whether such a barge is a "sea-going barge" within the meaning of 35 U. S. Sts. at Large, c. 212, so that it is subject to inspection by federal inspectors of steamboats and is specifically excluded from the operation of the State statute, is a question of fact to be determined by the jury.

St. 1907, c. 465, as amended by St. 1909, c. 393, § 1, requiring the inspection and approval of steam boilers not "under the jurisdiction of the United States," is not unconstitutional as encroaching upon a field of federal authority merely because it may affect a vessel afloat on tide water.

St. 1907, c. 465, as amended by St. 1909, c. 393, § 1, requiring the inspection and approval of "all steam boilers and their appurtenances except . . . boilers under the jurisdiction of the United States," although it may affect commerce on the high seas or interstate or foreign commerce, is a proper exercise of the police power by the Commonwealth, and is constitutional.

Rugg, C. J. This is a complaint for violation of the boiler inspection laws of this Commonwealth. The material portions of St. 1907, c. 465, as amended by St. 1909, c. 393, § 1, are: "All steam boilers and their appurtenances, except . . . boilers under the jurisdiction of the United States, shall be thoroughly inspected internally and externally at intervals of not over one year. . . . No certificate of inspection shall be granted on any boiler installed after May first, nineteen hundred and eight, which does not conform to the rules formulated by the board of boiler rules."

The facts are that the defendant in 1911 was constructing a breakwater at Provincetown, whither it transported stone on a barge or lighter known as "No. 43" from Rockport, both places being within the territorial limits of Massachusetts. The barge or lighter was loaded with stone at dock in Rockport, and then was towed in as straight a course as navigation would permit across the high seas to the harbor of Provincetown, where it was unloaded. "No. 43" was built at Baltimore, in the State of Maryland, in 1910. Her tonnage was three hundred and thirty net tons. Her dimensions were, length one hundred and fifteen feet over all, ninety-one feet over bottom and width thirty-five feet with two bulkheads extending its entire length, both ends being square and shaped alike, but not vertical, and the bottom being flat. She had no sails nor means of self-propulsion nor rudder, and

could progress only by being towed. The load was carried entirely on deck, and the hatches were never opened. She had a deck house, in which were a boiler, pump, two engines and sleeping quarters. The boiler, which was used only for loading and unloading its cargo and weighing anchor, was found by the State inspector not to be in safe working condition in November, 1911, and no certificate of inspection had been granted for it as required by the statute. It was installed after January 1, 1908, and was not inspected by the State officers when installed. Immediately after being built "No. 43" was used on the tow from quarries at Bellevue in the State of Delaware to the jetties then being built at Cape May, in the State of New Jersey, the route lying partly over the open sea. In the spring of 1911 she was towed from Cape May over the high seas around Cape Cod to Rockport, and used in carrying stone for the Provincetown breakwater.

Numerous requests for instructions were presented by the defendant. As we understand the exceptions, the judge * ruled that "if the jury find that the vessel known as No. 43 is a sea-going barge, the boiler upon it was under the jurisdiction of the United States," and then directed a verdict of guilty. This was equivalent to a ruling that "No. 43" was not a sea-going barge, and was not "under the jurisdiction of the United States."

The first question relates to the correctness of this ruling. "Jurisdiction," like many other words in general use, has different meanings, dependent upon the connection in which it is found and the subject matter to which it is directed. But it is always a word of comprehensive import. It cannot be assumed that the Legislature employed it in the sense of territorial limits. It must refer to a situation over which concurrent legislative power of both a State and the United States might be supposed to exist under our system of government. As applied to a sovereign, either State or nation, jurisdiction signifies the authority to make and declare the law, the right to apply the law to the acts of persons, and the power to enforce the law under all circumstances. *Commonwealth* v. *Manchester*, 152 Mass. 230, 246. *Wedding* v. *Meyler*, 192 U. S. 573, 584. *Nielsen* v. *Oregon*, 212 U. S. 315, 320. This broad definition, however, requires further limitation and speci-

---

* *White,* J.

fication with respect to the possible conflict between State and nation growing out of the dual government prevailing in this country. In using "jurisdiction" the Legislature hardly could have intended to exclude from the operation of the statute everything over which the United States, by the fullest exercise of its powers under the Constitution, might assume authority. There is an extensive field of human activity over which the States may exercise jurisdiction, until the United States through Congress asserts its power. Illustrations of this are found in pilotage regulations, *Olsen* v. *Smith*, 195 U. S. 332, 341, quarantine laws, *Morgan's Steamship Co.* v. *Louisiana Board of Health*, 118 U. S. 455, and many aspects of interstate commerce, *Northern Pacific Railway* v. *Washington*, 222 U. S. 370. There is a different field illustrated by another class of cases, in which it has been held that the States may pass laws in the exercise of the police power general in their nature and operating widely, and not relating primarily to subjects under federal control, which nevertheless may incidentally affect such subjects in common with all other property and rights within their territory. Questions of this sort have arisen most frequently in connection with interstate commerce. See cases collected in *Commonwealth* v. *Peoples Express Co.* 201 Mass. 564, at 578.

The character of this legislation, its humane objects and its comprehensive phrase, in the light of these well recognized and ample boundaries within which the State may exercise its power, forbid a narrow construction of the operative language of the statute. The matter of boiler inspection is one affecting the safety of large numbers of people and considerable amounts of property. It is of vital concern, directly or indirectly, to very many persons. The legislation is general in character, and is designed to operate widely. These considerations, in view of the principles of constitutional law which have been adverted to, lead to the conclusion that "jurisdiction of the United States" in the connection now being considered means the exclusive authority of the United States or its authority actually asserted to apply its controlling law to the subject. More specifically stated "boilers under the jurisdiction of the United States," as these words are used in the exceptions of the statute, does not mean those over which the United States by putting forth all the powers granted to it might

exercise jurisdiction if it choose to do so, but does mean those over which in fact that power already has been exercised, and those over which in no event could a State law be effectual because solely under the power of the United States.

The next step is to inquire whether the boiler in question was under the jurisdiction of the United States as thus defined. The inspection of boilers upon craft like "No. 43," used not for navigation or propulsion but for hoisting alone, is not exclusively national in character, relating wholly to the external concerns of the country, so that jurisdiction is vested solely in the federal government. Undoubtedly, "No. 43" is a "vessel" as defined in U. S. Rev. Sts. § 3: "The word 'vessel' includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water." It thus may be within the admiralty jurisdiction of the United States, if that aspect of its character be involved. *The Robert W. Parsons,* 191 U. S. 17, 30. But this is not decisive against a State statute general in its scope, and otherwise valid, even though it may occasionally and temporarily interrupt the use of the vessel in domestic or foreign commerce. *Martin* v. *West,* 222 U. S. 191, 198. That the vessel was enrolled and licensed under the laws of the United States did not remove it necessarily from the police power of the State. *Anderson* v. *Pacific Coast Steamship Co.* 225 U. S. 187.

It remains to ascertain whether the United States has assumed jurisdiction over the inspection of such boilers as that now under consideration. Being used exclusively upon tide water and having thus a possible direct relation to coastwise and foreign commerce upon the high seas, plainly the entire subject might be regulated by the United States. See *Wisconsin* v. *Duluth,* 96 U. S. 379, 387. By 35 U. S. Sts. at Large, 428, c. 212, approved May 28, 1908, it was enacted by § 10 "That on and after January first, nineteen hundred and nine, the local inspectors of steamboats shall at least once in every year inspect the hull and equipment of every sea-going barge of one hundred gross tons or over, and shall satisfy themselves that such barge is of a structure suitable for the service in which she is to be employed, has suitable accommodations for the crew, and is in a condition to warrant the belief that she may be used in navigation with safety to life."

It is argued that the "equipment" which is to be inspected under this section refers only to those "appliances" with which under § 11 of the same act "every such barge shall be equipped," viz., "at least one life boat, at least one anchor with suitable chain and cable, and at least one life-preserver for each person on board," and hence does not include boilers for moving the cargo. But this seems to us too cramped a construction. The duty imposed by § 10 upon the steamboat inspectors is not only to examine the hull and equipment, but also to certify that the barge may be used in navigation with safety to life. Navigation may include a vessel at anchor or at dock under certain circumstances, as well as in motion. *Hayn* v. *Culliford,* 3 C. P. D. 410, 417. *Laurie* v. *Douglas,* 15 M. & W. 746. *Zorn* v. *New York,* 45 App. Div. (N. Y.) 163. See *The Silvia,* 171 U. S. 462, 466. The evident aim of the federal statute is to promote the safety of those on shipboard, and it should be given a broad rather than a restricted scope in order to effectuate its purpose. The safety of those upon other vessels may be involved as well as those upon the one to be inspected. While it might be possible to construe the federal statute of 1908 as covering only the matters definitely mentioned, it seems to us more consonant with its general scope to interpret it as empowering the local steamboat inspectors to examine everything connected with the barge which may affect the safety of life. It needs no argument to demonstrate that boilers come within this class of barge equipment. Steamboat inspectors must be qualified to make such an inspection, for a part of their duty is to inspect boilers. (U. S. Rev. Sts. § 4418, as amended by act approved March 3, 1905, 33 U. S. Sts. at Large, 1027, c. 1456.)

It has been argued that "No. 43" is a "freight boat" within U. S. Rev. Sts. § 4427. But the terms of this section, its general purpose and context, and other sections of its Title LII, as well as 35 U. S. Sts. at Large, 428, c. 212, indicate that it applies only to vessels propelled in whole or in part by steam (U. S. Rev. Sts. § 4399) and has no relation to a craft like this.

The trial judge ruled, in substance, that "No. 43" was not and could not be found to be a "sea-going barge." We are of opinion that this was error. "Barge" is a word of somewhat comprehensive signification, and easily may include a vessel of this description. It is a matter of indifference whether it has any means of self-

propulsion or can go only in tow. *The Northern Belle,* 9 Wall. 526. The point of difficulty is whether it was "sea-going." No exact definition of this word has been given. In this connection we think it means a barge, which from its design and construction with fair reason, in the light of all the history of ocean-going vessels, may be expected to encounter and ride out the ordinary perils of the sea, and which in fact does go to sea. If a vessel is not designed upon such a plan or constructed of such materials or with such skill as to warrant a reasonable belief that she is staunch enough to venture upon the high seas, the mere fact that by selecting smooth water and fair weather she is able upon occasion to go there without mishap would not warrant the description of sea-going. But want of means of self-propulsion is not a conclusive test. She may still be sea-going if she is adapted to go by tow, and does so go upon the high seas. *Salt Union* v. *Wood,* [1893] 1 Q. B. 370, 374. See *Ellis* v. *United States,* 206 U. S. 246, 249. It is for the jury to say whether "No. 43" is a sea-going barge as thus defined. If it is found that she is, then the State statute does not apply to her; if she is not, it does.

The validity of a State statute in reference to the United States Constitution may be attacked from at least three different points.

(1) Because it covers a subject exclusively within the domain of federal government:

(2) Because it relates to a subject which although open to State legislation so long as the federal government has not acted, has been closed to the States by reason of legislation by Congress covering the field:

(3) Because although enacted in pursuance of the police power, a domain reserved generally to the States and denied to the United States government, it infringes some right secured under the Federal Constitution.

The present statute is assailed on all these grounds. But as it has been construed it is not vulnerable on any one of them.

1. The vessel is not subject to the exclusive jurisdiction of the federal government. Engagement in transportation upon tide waters does not make it so. The power granted by the United States Constitution to the federal government is extensive as to navigable waters and vessels engaged thereon in foreign and domestic commerce. Its power to regulate navigation is ample and

indisputable. *Gibbons* v. *Ogden,* 9 Wheat. 1, 193–197. But it is not exclusive as to the entire subject until Congress has acted. While Congress is silent there is a wide range in which the States may exercise their reserved and inherent powers. A State cannot impose any burdens upon the freedom of such navigation, even though the entire voyage may be intrastate. *The Daniel Ball,* 10 Wall. 557. *Moran* v. *New Orleans,* 112 U. S. 69. *Harman* v. *Chicago,* 147 U. S. 396. *Hughson* v. *Winthrop Steamboat Co.* 181 Mass. 325. *Miller* v. *Mayor of New York,* 109 U. S. 385. But it has been pointed out that pilotage laws and regulations which vitally and directly affect foreign commerce on the seas have been left to State regulation. *Olsen* v. *Smith,* 195 U. S. 332, 341. *Anderson* v. *Pacific Coast Steamship Co.* 225 U. S. 187, 195. The same is true of quarantine laws. *Compagnie Française de Navigation à Vapeur* v. *Louisiana State Board of Health,* 186 U. S. 380. *Louisiana* v. *Texas,* 176 U. S. 1. Liens for labor and materials upon vessels over which a court of admiralty has no jurisdiction may be regulated by State law, and enforced by State courts, even though the voyage thereby may be interrupted and commerce hampered. *The Winnebago,* 205 U. S. 354, 363. Negligence in the navigation of a vessel whereby damage is consummated on land may be made the subject of State legislation and liens upon such vessel provided to secure payment therefor may be within the jurisdiction of State courts, notwithstanding the deleterious effect upon navigation and commerce. *Martin* v. *West,* 222 U. S. 191. Bridges constructed lawfully over tide water or navigable rivers under the authority of the States, through the silence or inaction of Congress, possibly may be an unreasonable obstruction to navigation. But of course these cannot stand against the United States government when it exerts its power over interstate or foreign commerce. *Union Bridge Co.* v. *United States,* 204 U. S. 364, 400. *Monongahela Bridge* v. *United States,* 216 U. S. 177, 194. It is hard to conceive of instances more closely related to navigation than these. It follows that this statute is not void merely because it may affect a vessel afloat on tide water. A boiler upon such a craft as "No. 43" is subject to the jurisdiction of the federal government only in the event that that government has exercised its power in that direction.

2. The statute is interpreted as not applying to boilers over

which the United States has assumed jurisdiction, and hence it is not open to the second objection urged against its constitutionality. It is conceded that the United States may take upon itself the inspection of such boilers. The State statute by its express terms does not apply in such cases.

3. It is urged that because "No. 43" was licensed and registered under federal laws, it was thereby removed from subjection to any State law. But this argument is disposed of adversely to the defendant by *Anderson* v. *Pacific Coast Steamship Co.* 225 U. S. 187. Finally, it is suggested that the statute as interpreted is an interference with commerce, either interstate or over the high seas. But this objection is not tenable. The statute in question is not aimed exclusively against boilers used, directly or indirectly, in interstate or foreign commerce. It applies in the most general terms to all boilers within the Commonwealth, save those of the excepted classes. It was passed in the exercise of the police power for the protection and safety of persons and property. This is a power which is reserved to the States, and does not exist in the federal government, unless expressly granted to it. *Keller* v. *United States*, 213 U. S. 138, and cases cited. A law of this nature is not to be set aside lightly nor disregarded, unless its repugnance to some act of Congress or its interference with a right secured by the United States Constitution is so plain, direct and positive that the two cannot stand together. *Sinnot* v. *Davenport*, 22 How. 227, 243. The disaster liable to ensue from the use of boilers which are unsafe is very great. The general purpose of the statute is so humane that it cannot be held to be an imposition upon navigation. It is not within the principle of *Harman* v. *Chicago*, 147 U. S. 396, *Moran* v. *New Orleans*, 112 U. S. 69, and *The Roanoke*, 189 U. S. 185. It is obvious that the boiler upon "No. 43" is designed to be operated and used only or chiefly within the territorial limits of some State. The loading, unloading and weighing of anchor of necessity ordinarily must be done only at dock or within one marine league from seashore. Dangers to be averted by inspection of its boilers, if she is not a "sea-going barge" must exist within the territory of the Commonwealth and threaten our citizens or those for whom, directly or indirectly, the State may have some responsibility. General legislation for their protection, even though it may affect commerce on the high seas or interstate

or foreign commerce, is well within the principle of numerous decisions. *Missouri Pacific Railway* v. *Larabee Flour Mills Co.* 211 U. S. 612. *Standard Stock Food Co.* v. *Wright,* 225 U. S. 540, 549. *Savage* v. *Jones,* 225 U. S. 501, 525. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, and cases cited at 26. *Ewing* v. *Leavenworth,* 226 U. S. 464. *Rosenbush* v. *Bernheimer,* 211 Mass. 146.

No error is disclosed in the refusal to grant requests for instructions. If on a new trial "No. 43" should be found to be a "sea-going barge" as we have defined those words, the defendant will be entitled to an acquittal; if it shall be found to be not a sea-going barge, then the defendant is guilty of the offense charged.

*Exceptions sustained.*

*H. W. Barnum,* for the defendant.

*J. T. Kenney,* District Attorney, for the Commonwealth.